1  STEVEN G. KALAR
   Federal Public Defender
2  ELIZABETH M. FALK
   ELLEN V. LEONIDA
3  Assistant Federal Public Defender
   450 Golden Gate Avenue
4  San Francisco, CA  94102
   Telephone:  (415) 436-7700
5  Telefacsimile: (415) 436-7706

6  Counsel for Defendant CHAMBERLAIN

7

8
                    IN THE UNITED STATES DISTRICT COURT
9
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN FRANCISCO DIVISION
11

12                                    )
13                                    )   No. CR-14-0316 VC
                                      )
14                                    )   DEFENDANT'S *AMENDED* MOTION TO
   UNITED STATES OF AMERICA,          )   DISMISS COUNT SIX  OF THE THIRD
15                                    )   SUPERSEDING INDICTMENT FOR
                Plaintiff,            )   LACK OF SUBJECT MATTER
16                                    )   JURISDICTION (FRCP 12(b)(2)); MOTION
                                      )   FOR JUDGMENT OF ACQUITTAL ON
17  v.                                )   COUNT SIX ON SAME GROUNDS
                                      )
18                                    )   MEMORANDUM OF POINTS AND
                                      )   AUTHORITIES IN SUPPORT THEREOF
19  RYAN CHAMBERLAIN,                 )
                                      )   Date:   February 9, 2015
20                Defendant.          )   Time:  10:30 a.m.
                                      )   Court:  The Honorable Vince Chhabria
21  _____ )

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3    TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

4

5    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6

7    FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8        I.      Evidence Items Located in Mr. Chamberlain's Apartment. . . . . . . . . . . . . . . . . . 4

9

10   LEGAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11       I.      HISTORY OF 18 U.S.C. § 229 - THE CHEMICAL WEAPONS ACT. . . . . . . . . 6

12               A.      The Treaty - the Chemical Weapons Convention of 1997.. . . . . . . . . . . . . 6

13               B.      Ratification and Implementation .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14       II.     BOND V. UNITED STATES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15               A.      Facts of *Bond*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16               B.      The Supreme Court's Majority Holding in *Bond* Dodges Constitutional

17                       Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18               C.      The Concurring Opinions in *Bond* Find the Statute Unconstitutional.. . . 11

19

20   ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21       I.      UNDER THE BOND MAJORITY APPROACH, THIS COURT MUST

22               DISMISS COUNT SIX BECAUSE 18 U.S.C. § 229(a)(1) DOES NOT REACH

23               THE ALLEGATIONS OF MR. CHAMBERLAIN'S PURELY LOCAL

24               CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25               A.      The Particular Chemical Allegedly "Used" by Mr. Chamberlain do not

26                       Support the Prosecution of Count Six in Federal Court.. . . . . . . . . . . . . 14

27

28

*US v. Chamberlain*, Case No. 14-0316 VC;
Def.'s First Motion to Dismiss/Motion for
Judgment of Acquittal as to Count Six                    ii

1        B.     The Circumstances in Which Mr. Chamberlain Allegedly "Used" the

2              Sodium Cyanide Do Not Support the Prosecution of this Count in Federal

3              Court.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4    II.   THIS COURT MUST DISMISS COUNT SIX BECAUSE 18 U.S.C. § 229(a)(1)

5        IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD, BOTH AS

6        INTERPRETED BY THE SUPREME COURT IN *BOND* AND BECAUSE THE

7        SUPREME COURT'S NEW DEFINITION OF "CHEMICAL WEAPON" FAILS

8        CONSTITUTIONAL SCRUTINY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

9        A.     The Plain Text of the Statute is Unconstitutionally Vague . . . . . . . . . . . 18

10       B.     The "New" § 229 Exacerbates the Statute's Vagueness Problems. . . . . . 19

11   III.  THIS COURT MUST DISMISS COUNT SIX BECAUSE IN ENACTING THE

12        BROADLY DRAFTED CHEMICAL WEAPONS ACT, CONGRESS

13        EXCEEDED ITS AUTHORITY IN VIOLATION OF THE 10TH AMENDMENT

14        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15        A.     18 U.S.C.  Exceeds Congress's Authority Under the Treaty Clause Read in

16              Concert with the Necessary and Proper Clause

17              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18              1.     As Applied to Mr. Chamberlain's Conduct, the Act is an

19                   Unconstitutional Extension of Federal Police Power . . . . . . . . . 21

20              2.     Mr. Chamberlain Concurs with Justices Scalia, Thomas and Alito

21                   that the Treaty Power is a Limited Federal Power and that the

22                   Chemical Weapons Act, as Drafted, Well Exceeds Congress'

23                   Authority to Implement Legislation to Further a Treaty Under the

24                   Necessary and Proper Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25        B.     18 U.S.C. § 229(a)(1) Exceeds Congress's Authority Under the Commerce

26              Clause.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

27   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28

*US v. Chamberlain*, Case No. 14-0316 VC;
Def.'s First Motion to Dismiss/Motion for
Judgment of Acquittal as to Count Six       iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atascadero State Hospital v. Scanlon*, 105 S. Ct. 3142 (1985). . . . . . . . . . . . . . . . . . .   10

*Bond v. United States*, 134 S. Ct. 2077 (2014).  . . . . . . . . . . . . . . . . . . . . . . . . . . .  *passim*

*Bouie v. City of Columbia*, 378 U.S. 347 (964). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Gonzalez v. Raich*, 545 U.S. 1 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Grayned v. City of Rockford*, 408 U.S. 104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Gregory v. Ashcroft*, *111* S. Ct. 2395 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*Johnson v. United States*, 135 S. Ct. 2551 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Kolender v. Lawson*, 461 U.S. 352 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 18

*Missouri v. Holland*, 252 U.S. 416 (1920). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23, 24

*Reid v. Covert*, 354 U.S. 1 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*Sabri v. United States*, 541 U.S. 600 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*United States v. Bass*, 92 S. Ct. 515 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*United States v. Fries*, 2012 WL 689157 (D. Ariz., Feb. 28, 2012). . . . . . . . . . . . . . . 14

*United States v. Fries*, 781 F.3d 1137 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . .   24

*United States v. Ghane*, 673 F.3d 771 (8th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . .  13, 15

*United States v. Lopez*, 514 U.S. 549 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 25, 26

*United States v. Morrison*, 529 U.S. 598 (2000). . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

*United States v. Washam*, 312 F.3d 926 (8th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . .   17

*United States v. Williams*, 553 U.S. 285 (2008). . . . . . . . . . . . . . . . . . . . . . . . . .  17, 18

*Village of Hoffman Estates v. Flipside*, 102 S. Ct. 1186 (1982). . . . . . . . . . . . . . . . .   18

## DOCKETED CASES

*United States v. Detrixhe*, Case No 2:08-CR-42-J-BB (N.D. Tex. 2008). . . . . . . . . . . .   14

*United States v. Konopka*, Case No. 02-CR-224 (N.D. Ill 2002). . . . . . . . . . . . . . . . .   14

*United States v. Krar*, Case No. 6:03CR36 (1)(E. D. Tex 2003). . . . . . . . . . . . . . . . . .   14

*US v. Chamberlain*, Case No. 14-0316 VC;
Def.'s First Motion to Dismiss/Motion for
Judgment of Acquittal as to Count Six                    iv

1

2 **FEDERAL STATUTES**

3 18 U.S.C. § 229(a)(1)................................................... *passim*

4 18 U.S.C. §229F(7). ..................................................  18, 19

5 Fed. R. Crim. P. 12(b)(2)..................................................  2

6 Fed. R. Crim. P. 29. ...................................................  2, 5

7 U.S. Const. amend. X....................................................  21

8 U.S. Const. art. I § 8...................................................  9, 10

9

10 **MISCELLANEOUS**

11 Bradley, Current Developments: Federalism, Treaty Implementation, and Political
Process: *Bond v. United States*.  108 A.J.I.L 486, 495 (July 2014) ................. 19

12

13 Harvard Law Review Association, Clear Statement Rules, Federalism, and Congressional
Regulation of States 107 Harv. L. Rev. 1959 (June, 1994)....................  10

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*US v. Chamberlain*, Case No. 14-0316 VC;
Def.'s First Motion to Dismiss/Motion for
Judgment of Acquittal as to Count Six            v

STEVEN G. KALAR
Federal Public Defender
ELIZABETH M. FALK
ELLEN V. LEONIDA
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA  94102
Telephone:  (415) 436-7700
Telefacsimile: (415) 436-7706

Counsel for Defendant CHAMBERLAIN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RYAN CHAMBERLAIN,<br><br>Defendant. | No. CR-14-0316 VC<br><br>DEFENDANT'S ***AMENDED*** MOTION TO DISMISS COUNT SIX  OF THE THIRD SUPERSEDING INDICTMENT FOR LACK OF SUBJECT MATTER JURISDICTION (FRCP 12(b)(2)); MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SIX ON SAME GROUNDS<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Date:   February 9, 2015<br>Time:  10:30 a.m.<br>Court:  The Honorable Vince Chhabria |

TO:     UNITED STATES OF AMERICA, PLAINTIFF; AND BRIAN STRETCH, ACTING UNITED STATES ATTORNEY, NORTHERN DISTRICT OF CALIFORNIA; AND PHILIP KEARNEY AND ADAM WRIGHT, ASSISTANT UNITED STATES ATTORNEYS:

PLEASE TAKE NOTICE that on February 9, 2016, before the Honorable Vince

Chhabria, defendant Ryan Chamberlain will move this Court for an order dismissing Count Six

of the Superseding Indictment charging him with a violation of 18 U.S.C. § 229(a)(1),

Possession of  a Chemical Weapon, on the grounds articulated by the Supreme Court in *Bond v.*

*United States*, 134 S. Ct. 2077 (2014).

To the extent this Court determines that additional fact finding is necessary to adjudicate

this motion, Mr. Chamberlain requests the Court hold this motion in abeyance until the conclusion of the government's case-in-chief, and reconsider it as a Motion for Judgment of Acquittal on Count Six.

Th motion is based on the following Memorandum of Points and Authorities, the constitution of the United States, all relevant statutory authority and case law, Fed. R. Crim. P. 12(b)(2), Fed. R. Crim. P. 29, and such argument as may be presented at the hearing of this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

"I suspect the Act[1] will not survive today's gruesome surgery. A criminal statute must clearly define the conduct is proscribes. If it does not "give a person of ordinary intelligence fair notice" of its scope, it denies due process. The new § 229(a)(1) fails that test. Henceforth, a person "shall be fined ... imprisoned for any term of years or both . . whenever he "develops, produces, otherwise acquires, transfers, directly or indirectly, receives, stockpiles, retains, owns, possesses, or uses, or threatens to use (1) any chemical "of the sort that an ordinary person would associate with instruments of chemical warfare" (emphasis added). Whether that test is satisfied, the Court unhelpfully (and also illogically) explains, depends not only on the "particular chemicals that the defendant used" but also on "the circumstances in which she used them" . . . Moreover, the Court's illogical embellishment seems to apply only to the "use" of a chemical, but "use" is only one of 11 kinds of activity the statute prohibits. What, one wonders, makes something a "chemical weapon" when it is merely "stockpile[d} or possess[ed]?" To these questions, and countless others, one guess is as bad as another.

No one should have to ponder the totality of the circumstances in order to determine whether his conduct is a felony. Yet that is what the Court will now require of all future handlers of harmful toxins - that is to say, all of us. Thanks to the Court's revisions, the Act, which before was merely broad, is now broad and unintelligible. "[N]o standard of conduct is specified at all." Before long, I suspect, courts will be required to say so.

*Bond v. United States*, 134 S. Ct. 2077, 2097 (2014)(Scalia, J., concurring in the judgment)(citations omitted).

On October 22, 2015, nearly seventeen months after Mr. Chamberlain's arrest, the government superceded the Indictment in this case a third time. The last charge, Count Six,

_____

[1] 18 U.S.C. § 229(a)(1)

1  alleges that Mr. Chamberlain possessed a chemical weapon in violation of 18 U.S.C. § 229(a)(1)

2  (the Chemical Weapons Act) – a statute recently challenged in front of the Supreme Court in

3  *Bond v. United States,* 134 S. Ct. 2077 (2014).  Like that case, the allegations against Mr.

4  Chamberlain present no "acts of war, assassination and terrorism."  *Id*. at 2092.  Instead, the

5  supposed "chemical weapon" alleged in this count is approximately 4.5 grams – **less than a**

6  **teaspoon** – of sodium cyanide, along with a small (3" by 1" diameter) energy drink bottle

7  allegedly containing a 13 ml mixture of ethyl alcohol, water and a detectable amount of sodium

8  cyanide.   As Mr. Chamberlain understands it, the government's case-in-chief lacks *any* evidence

9  that Mr. Chamberlain either intended to use this chemical to harm any person or persons, or did

10  so.  It is further anticipated that the government will present no evidence of a target, a plan, or

11  any nefarious purpose on the part of  Mr. Chamberlain with respect to this minute quantity of

12  sodium cyanide.  Just as in *Bond*, the statute at issue plainly does not extend to the allegations of

13  Mr. Chamberlain's entirely local conduct - even assuming he did possess a teaspoon or less of

14  sodium cyanide.  To the extent it does, the Act is both unconstitutional as applied to him, and is

15  an unconstitutional extension of federal police power on the whole.

16      In other words, the prosecution of Mr. Chamberlain on Count Six squarely re-opens the

17  issues the Supreme Court grappled with and left unfinished in *Bond*.  As explained in detail

18  below, Mr. Chamberlain now moves to dismiss the charge that he violated section 229(a)(1)

19  because (1) his alleged conduct is not covered by the statute, as interpreted by the *Bond* Court,

20  (2) the statute is unconstitutionally vague, both as applied to his alleged conduct and on a whole,

21  as interpreted by the Supreme Court in *Bond*, and 3) 18 U.S.C. § 229(a)(1) itself is

22  unconstitutional due to its broad drafting, which sweeps in purely local conduct related to

23  poisons by its very terms, and thus exceeds Congress's authority to make laws under either the

24  Commerce Clause or to implement treaties under the Necessary and Proper Clause.

25      In making the instant motion, Mr. Chamberlain is cognizant that this Court "will not

26  decide a constitutional question if there is some other ground upon which to dispose of the

27  case." *Bond,* 134 S. Ct. at 2087.  Mr. Chamberlain further acknowledges that Justice Roberts'

28

1    majority opinion in *Bond* disposed of Bond's conviction while avoiding constitutional issues by

2    1) reviewing the facts of her case, and 2) holding that such acts constituted conduct of a "purely

3    local nature." *Id.*  These are fact-based inquiries, while the larger Tenth Amendment challenges

4    Mr. Chamberlain raises are not.  Accordingly, as to the constitutional issues raised here, Mr.

5    Chamberlain files the instant motion as a pretrial Motion to Dismiss on jurisdictional grounds.

6    As to the arguments raised that § 229(a)(1) cannot be construed to reach the allegations of Mr.

7    Chamberlain's purely local conduct, he files this motion as a Judgment of Acquittal on Count

8    Six on jurisdictional and constitutional grounds, to be renewed at the close of the government's

9    evidence.

10                              **FACTUAL BACKGROUND**

11   **I.    Evidence Items Located in Mr. Chamberlain's Apartment**

12            On May 31, 2014, law enforcement executed a warrant to search Mr. Chamberlain's

13   residence at 1831 Polk Street, #117, San Francisco, California, for abrin, a biological toxin.

14   During the search of Mr. Chamberlain's home, the government seized a number of items,

15   including a small quantity of white powder in a plastic bag, later labeled by the FBI as Evidence

16   Item 7.  *See* Declaration of Elizabeth M. Falk (hereafter, "Falk Decl."), Exhibit B, Photograph of

17   Powder in Evidence Item 7.[2]  This powder was later analyzed by Dr. Jason Brewer, Chemist

18   Forensic Examiner, who determined the weight of the powder to be 5.1879 grams.[3]  *See* Falk

19   Decl., Exhibit A, Brewer Report.  Through use of methods that "have not been validated for the

20   purpose of reporting quantitative results", Dr. Brewer "estimated" the concentration of sodium

21   cyanide within this substance at 90%, with a resulting analysis that the powder contained 4.6691

22

23

24         [2] As stated in the Falk Declaration, it is counsel's understanding that the glass jar and

25   plastic test tube pictured in Exhibit A are FBI collection/laboratory equipment; neither of these
     vessels were located in Mr. Chamberlain's apartment and are not the original container located

26   that contained the white powder.

27         [3] To put the volume of this powder in perspective, a teaspoon of salt is approximately

28   5.69 grams.  The charged sodium cyanide is accordingly less than a teaspoon in volume.

1   grams of sodium cyanide.  *Id*.[4]

2       In a footnote to his email report, Dr. Brewer places numerous caveats on the

3   aforementioned purity analysis on Evidence Item 7.  Specifically, he writes that "this value is an

4   approximation based on a one point comparison and an assumption of a linear instrumental

5   response as a function of cyanide concentration.  This approach has not been validated, an

6   estimation of uncertainty can not be provided, and there is no traceability for the estimated

7   purity.  Thanks, Jason."  *Id*.  Despite these numerous disclaimers, Dr. Brewer nonetheless

8   concludes that the 4.661 grams of "pure" sodium cyanide he identifies (90% of the 5.1879 gram

9   mixture) represents 30 lethal doses of sodium cyanide.  In supporting this figure, Dr. Brewer

10  cites one source - the "Disposition of Toxic Drugs and Chemicals in Man" (Randall C. Baselt,

11  5th Edition, page 412) - for an estimate of 200 mg of potassium cyanide as the "minimum adult

12  lethal dose."  *Id*.  Without citation, Dr. Brewer then converts the Baselt-reported 200 mg

13  potassium cyanide lethal dose to 150 mg of sodium cyanide.  *Id*.  Dividing 4.5 (4.666 rounded

14  down) by 150, Dr. Brewer arrives at his figure of 30 lethal doses in Evidence Item 7.[5]

15      In addition to the powder described above, Dr. Brewer tested the contents of a small blue

16  and black "relaxation shot" bottle located in Mr. Chamberlain's apartment, labeled by the FBI as

17  Evidence Item 12.  *See* Falk Decl., Exhibit D, Photograph of I Chill bottle.  According to reports

18  provided in discovery by Dr. Brewer, the 13 ml contents of the bottle (Evidence Item 41) tested

19  positive in some way for some form of cyanide, as well as for water and ethyl alcohol.  *See* Falk

20  Decl, Exhibit C (photograph of liquid); *see also* Exhibit E, Brewer Report at 11253.  Per this

21  report, specific details do not exist about the purported percentage of cyanide within Evidence

22  Item 41.  *See id*.

23  _____

24      [4] Mr. Chamberlain has challenged the aforementioned analysis in his First Motion *in
    Limine*.  *See* Docket 145.  For the purpose of this Motion to Dismiss, however, Mr. Chamberlain
25  will assume all facts in the government's favor; he reserves the right to submit a new factual
    recitation in support of this Motion should the Court elect to adjudicate it as a Motion for
26  Judgment of Acquittal under FRCP 29.

27      [5] Once again, to put this figure in perspective, Evidence Item 7 measures less than a
28  teaspoon in volume.  *Id*.; see also Falk Decl. at ¶ 14.

1   To date, the government has not provided Mr. Chamberlain any discovery reflecting any

2   intent on Mr. Chamberlain's part to use the sodium cyanide *for anything*, much less to harm

3   another person or person.  The government's case similarly lacks evidence as to where Mr.

4   Chamberlain allegedly obtained the sodium cyanide and/or what he intended to use the sodium

5   cyanide for.

6                                   **LEGAL BACKGROUND**

7   **I.      HISTORY OF 18 U.S.C. § 229 - THE CHEMICAL WEAPONS ACT**

8           **A.      The Treaty - the Chemical Weapons Convention of 1997**

9           In 1992, in response to the horrors of chemical warfare inflicted upon soldiers and

10  civilians alike from the era of World War I through the Gulf War, an internationally-membered

11  group named the Conference on Disarmament began intensely drafting an international treaty

12  against the use or development of chemical weaponry. See Falk Decl, Exhibit F, Genesis and

13  Historical Development of CWC, at 3.  These efforts culminated in 1996 with the Chemical

14  Weapons Convention, an international arms-control agreement established to "achieve effective

15  progress towards general and complete disarmament . . . including the prohibition and

16  elimination of all types of weapons of mass destruction."  *See* Falk Decl, Exhibit G at 1,

17  *Convention on the Prohibition of the Development, Production, Stockpiling, and Use of*

18  *Chemical Weapons and on Their Destruction*, Preamble.  In a series of Articles, the treaty

19  requires signatory states to adhere to a number of obligations and rules, including:

20              a) a prohibition on the development, production, acquisition, stockpiling,

21              retention, or transfer of chemical weapons;

22              b) a prohibition on the use of chemical weapons;

23              c) a prohibition on engaging in military preparations for the use of chemical

24              weapons;

25              d) a prohibition on any nation to "assist, encourage or induce" anyone to engage

26              in any of the aforementioned activities.

27      *Id*. at Article I (p. 2).  The treaty also obliges signatories to destroy chemical weapons

28

1  that "it owns or possesses, or that are located in any place under its jurisdiction or control." *Id*.

2  Finally, the nation state signatories must destroy chemical weapons abandoned on other

3  properties, destroy chemical weapons production facilities, and restrain from the use of riot

4  control agents as "methods of warfare." *Id*.

5         The Convention defines the term "chemical weapon" in Article II.  As relevant here,

6  "chemical weapons" are "(a) toxic chemicals and their precursors, except where intended for

7  purposes not prohibited under this Convention, as long as the types and quantities are consistent

8  with such purposes." *Id*. at 3.  Toxic chemical is then further defined as "any chemical which

9  through its chemical action on life processes can cause death, temporary incapacitation or

10 permanent harm to humans or animals.  This includes all such chemicals, regardless of their

11 origin or of their method of production, and regardless of whether they are produced in facilities,

12 in munitions, or elsewhere." *Id*.  As expressed "for the purpose of implementing the

13 Convention", certain toxic chemicals subjected to international verification measures by means

14 of neutral inspectors were specified as particularly dangerous by the Convention, and are listed

15 under Schedules I, II, and III.  *Id*. at 3; *see also* Convention at 49-54 (listing various toxic

16 chemicals and the corresponding schedules.)  While sodium cyanide is not listed under any of

17 the Schedules, there is little doubt among scholars and scientists alike that sodium cyanide – a

18 fast acting poison - falls under the CWC's broad definition of "toxic chemical."

19        Article VII of the Convention addresses the requirements for signatory states to

20 implement the Convention's obligations on home territory.  In this vein, signatory state parties

21 Shall, in accordance with its constitutional processes, adopt the necessary measures to

22 implement its obligations under this Convention.  In particular, it shall:

23        (a)    Prohibit natural and legal persons anywhere on its territory or in any other place

24               under its jurisdiction as recognized by international law from undertaking any

25               activity prohibited to a State Party under this convention, including enacting

26               penal legislation with respect to such activity;

27        (b)    Not permit in any place under its control any activity prohibited to a State Party

28

1    under this Convention, and

2    (c)    Extend its penal legislation enacted under subparagraph (a) to any activity

3           prohibited to a State Party under this Convention undertaken anywhere by natural

4           persons, possessing its nationality, in conformity with international law.

5    *Id*. at p. 18.  From this text, it is clear that the implementation requirements of the CWC

6    necessitate any State Party to "enact penal legislation" that "prohibits natural persons" from

7    undertaking any activity prohibited to a States Party under the Convention"

8           **B.      Ratification and Implementation**

9           In 1997, the United States ratified the treaty.  Because the Convention itself was "not

10   self-executing" it required additional domestic legislation to implement the treaty and comply

11   with its mandates.  *See* Bond, 134 S. Ct. at 2085. Thus arose the Chemical Weapons Convention

12   Implementation Act of 1998, which closely tracks the language of the Treaty itself.  *Id.*  In order

13   to "fulfill its obligations under the Convention," Congress decided to mirror the language of the

14   treaty with respect to terms such as "chemical weapon," "toxic chemical," and "peaceful

15   purpose."  *Id.* at 2084-2085; *see also* Falk Dec., Convention, Exhibit G at Art. II(1)(a), II(2),

16   II(9)(a).

17          Few criminal prosecutions ensued in this country under 18 U.S.C. § 229(a)(1) after the

18   implementation legislation passed.  Then in 2007, the case of Carol Ann Bond arose.

19   ***II.    BOND V. UNITED STATES***

20          **A.      Facts of *Bond***

21          In *Bond*, the Supreme Court addressed the conviction of defendant Carol Anne Bond in

22   Pennsylvania for violating the identical section of 18 U.S.C. § 229 charged here - possession

23   (and in Ms. Bond's case, use) of a chemical weapon  *Id.* at 2085.  In that case, the defendant

24   stole an unknown quantity of "10-chloro-10H-phenoxarsine" from her employer and ordered

25   "potassium dichromate (a chemical commonly used in printing photographs or cleaning

26   laboratory equipment) on Amazon.  *Id.*  Both chemicals are toxic and lethal to humans.  *Id.*  No

27   less than 24 times, Bond attempted to harm her husband's pregnant girlfriend by spreading

28

1    combinations of these chemicals on "her car door, mailbox, and door knob." *Id.*  Bond was

2    eventually caught by U.S. postal inspectors on video and was charged in federal court. *Id*.  After

3    the district court denied her constitutional and statutory challenges, she pled guilty under a

4    conditional plea agreement that preserved the right to appeal the constitutionality of her

5    conviction. *Id*. at 2086.  The case eventually made its way to the Supreme Court, which

6    considered whether § 229 "reaches a purely local crime: an amateur attempt by a jilted wife to

7    injure her husband's lover, which ended up causing only a minor thumb burn readily treated by

8    rinsing with water . . . " *Id*. at 2083.

9        Before the Court, Bond set forth three arguments that her conviction should be

10    overturned.  *See* Falk Dec., Exhibit H, Brief for Petitioner, *Bond v. United States*, No. 12-158

11    (May 8, 2013).  First, Bond argued that § 229 on the whole is unconstitutional under the 10th

12    Amendment because it attempts to codify a "general federal police power" under the guise of

13    implementing a treaty, which is an unconstitutional extension of the authority granted to

14    Congress under the Necessary and Proper Clause, (U.S. const. art. I § 8. cl.18).  *Id.* at 18.

15    Second, she argued that the Court could avoid this constitutional issue by instead interpreting the

16    statute as "appl[ying] only to the kind of conduct the Convention addresses - namely, warlike

17    conduct that would violate the Convention if undertaken by a signatory state . . .[to] comport

18    with Congress' view that a violation of section 229 is per se a crime of terrorism."  *Id*.  Third,

19    Bond argued that the statute was an unconstitutional extension of federal police power as

20    applied to her conduct, in violation of the 10th Amendment.  *Id*. at 19.

21       **B.**    **The Supreme Court's Majority Holding in *Bond* Dodges Constitutional Issues**

22        Writing for the majority, Chief Justice Roberts agreed with Bond and overturned her

23    conviction.  *Id.* at 2094.  Much to the dismay of the three concurring justices, however, the

24    majority opinion failed to consider the constitutionality of § 229, but held instead that the statute

25    was inapplicable to Bond's conduct under a newly declared "clear statement rule" – that

26    Congress must not have intended § 229(a) to reach the "purely local criminal activity" that was

27    Bond's conduct.  *See id.* at 2083; *see also Gregory v. Ashcroft, 111 S. Ct. 2395, 2401 (1991);*

28

*US v. Chamberlain*, Case No. 14-0316 VC;
Def.'s First Motion to Dismiss/Motion for
Judgment of Acquittal Re: Count Six      9

1   *Atascadero State Hospital v. Scanlon,* 105 S. Ct. 3142, 3147 (1985)(setting forth clear statement

2   jurisprudence); *see also* Harvard Law Review Association, Clear Statement Rules, Federalism,

3   and Congressional Regulation of States.  107 Harv. L. Rev. 1959 (June, 1994):

4           Clear statement rules, with their requirement of express indications of
            congressional intent to effect certain specific legislative goals, stand at a remove
5           from a strictly textualist methodology. Although such rules appear to fit
            comfortably within a textualist approach in that they emphasize attention to
6           statutory language, clear statement requirements reflect considerations that are
            necessarily external to the statutory text itself.  *Such rules operate to foreclose a*
7           *particular interpretation of a statute even though consideration of the legislative*
            *text alone -- its language and structure -- might point to a different meaning than*
8           *the one dictated by the rule.*

9
10          *Id*. (emphasis added). Under this doctrinal principle, and to avoid the larger

11  constitutional questions raised by Bond, the Court overturned her conviction based on a

12  "perceived ambiguity" in  229(a):

13              These precedents make clear that it is appropriate to refer to basic principles of
            federalism embodied in the Constitution to resolve ambiguity in a federal statute. In this
14          case, the ambiguity derives from the improbably broad reach of the key statutory
            definition given the term—"chemical weapon"—being defined; the deeply serious
15          consequences of adopting such a boundless reading; and the lack of any apparent need to
            do so in light of the context from which the statute arose—a treaty about chemical
16          warfare and terrorism. We conclude that, in this curious case, we can insist on a clear
            indication that Congress meant to reach purely local crimes, before interpreting the
17          statute's expansive language in a way that intrudes on the police power of the States.

18  *Bond*, 134 S. Ct. at 2090 (citing *United States v. Bass* 92 S. Ct. 515 (1971)).

19          The "clear statement rule" evolving from the *Bond* decision imparts a new, narrower

20  reading of permissible federal prosecutions under the statute, in order to ensure that the exertion

21  of federal jurisdiction in a particular case does not violate the 10th Amendment.  In particular,

22  the Court narrowed the "very broad" definition of "chemical weapon" articulated in the text of

23  the statute, to ensure that the accusations of "use of a chemical weapon" go beyond "use[] [of] a

24  chemical in a way that caused some harm."  *Id*. at 2090.  In order to do so, the Court found it

25  appropriate to look past the statutory definition of "chemical weapon" in favor of its' "ordinary

26  meaning," which necessarily "takes account of both the particular chemicals that the defendant

27  used and the circumstances in which she used them." *Id*.  Taking what can only be described as a

28  common sense approach, the Court further held that the ordinary meaning of "chemical weapon"

"typically connotes '[a]n instrument of offensive or defensive combat' or 'an instrument of attack or defense in combat, as a gun, missile, or sword." *Id.*  Any other reading, the Court held, would "transform the statute from one whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults." *Id*. at 2092 ("As the Government reads section 229, 'hardly' a poisoning 'in the land would fall outside the federal statute's domain.'")(citation omitted).

**C.    The Concurring Opinions in *Bond* Find the Statute Unconstitutional**

Concurring in the Court's judgment only, Justice Scalia's scathing concurrence in *Bond* fails to find the ambiguity in § 229(a)(1)'s definition of "chemical weapon" that the majority opinion does.  *Id*. at 2096 (Scalia, J. concurring).  Instead, the concurrence laments the majority's effort to convolute a clear definition of "chemical weapon" into an arbitrary one, as a criminal statute must "clearly define the conduct it proscribes.  If it does not 'give a person of ordinary intelligence fair notice' of its scope, it denies due process." *Id*. at 2097.  According to at least three justices, "the *new* § 229(a)(1) fails that test" because the statute no longer contains a clear statement of prohibited conduct.  *Id*.  As Justice Scalia views the revised statute, use of particular chemicals are now covered depending on circumstance - and only after-the-fact is the appropriateness of federal jurisdiction determined.  *Id.* (comparing the potential poisoning of a goldfish to the potential poisoning of a Congressman's goldfish with intent to send a menacing message).  This does not give ordinary persons fair notice of the statute's prohibitions:

> We have here a supposedly "narrow" opinion which, in order to be "narrow", sets forth interpretive principles never before imagined that will bedevil our jurisprudence (and proliferate litigation) for years to come.  The immediate product of these interpretive novelties is a statute that should be the envy of every lawmaker bent on trapping the unwary with vague and uncertain criminal prohibitions.

*Id*. at 2102.  In addition to finding the "new" statute hopelessly vague, Justice Scalia's concurring opinion found the Act unconstitutional as applied to Bond.  *Id* at 2098. In this vein, Justice Scalia soundly rejected the proposition that the Necessary and Proper Clause intersects with the Treaty Clause in a manner that enables Congress to implement treaty obligations at the

1  expense of bedrock constitutional principles, such as the lack of a plenary federal police power.

2  *Id*. at 2098-2101 ("No law that flattens the principle of state sovereignty, whether or not

3  'necessary,' can be said to be 'proper.').  Because the government's sole defense of the

4  constitutionality of the statute rested on this intersection, the Act is unconstitutional to the extent

5  it conferred a general federal police power over Bond.

6

7                                    **ARGUMENT**

8  **I.    UNDER THE BOND MAJORITY APPROACH, THIS COURT MUST DISMISS
        COUNT SIX BECAUSE 18 U.S.C. § 229(a)(1) DOES NOT REACH THE
9       ALLEGATIONS OF MR. CHAMBERLAIN'S PURELY LOCAL CONDUCT**

10          Assuming the facts most favorably to the government, this case involves Mr.

11  Chamberlain's alleged possession of less than a teaspoon of sodium cyanide, as well as a small

12  "I Chill" energy shot bottle containing a detectable amount of sodium cyanide mixed with water

13  and ethyl alcohol.  This is a *tiny* amount of a toxic chemical – well beneath the quantities used in

14  local sodium cyanide poisoning cases routinely tried in state court.  *See, e.g.*,

15  http://www.cnn.com/2014/11/08/justice/pennsylvania-doctor-cyanide-poisoning/ (*Ferrante* case

16  in which doctor was convicted of purchasing a half pound of sodium cyanide for use in fatal

17  poisoning of wife).  Nor is Mr. Chamberlain's alleged possession of the teaspoon of sodium

18  cyanide accompanied by allegations that he intended to carry out any sort of terrorist plot, mass

19  murder, or any other action that would have "caused mass suffering".  Quite simply, the

20  government's case will fail to show that Mr. Chamberlain intended to do anything with the

21  alleged sodium cyanide, even if there is sufficient evidence that he possessed it.  The facts of the

22  instant case are accordingly more innocuous than *Bond* - a woman who not only purchased lethal

23  quantities of two toxic chemicals, but attempted to use them 24 times to harm another human

24  being.

25          *Bond* simply does not support the prosecution of Mr. Chamberlain on Count Six of the

26  Third Superceding Indictment.  In its holding, the *Bond* court indicated that the proper scope of

27  the criminal statute involved "terrorist plots or the possession of extremely dangerous substances

28

1   *with the potential to cause severe harm to many people.* " *Bond*, 134 S. Ct. at 2092 (emphasis

2   added)(citing *United States v. Ghane*, 673 F.3d 771 (C.A.8 2012) (defendant possessed enough

3   potassium cyanide – 177 grams at 75% pure – to kill 450 people); *United States v. Crocker*, 260

4   F. App'x 794 (6th Cir. 2008) (defendant attempted to acquire VX nerve gas and chlorine gas as

5   part of a conspiracy made with an undercover FBI agent to attack a federal courthouse); *United*

6   *States v. Krar*, 134 F. App'x 662 (5th Cir. 2005) (per curiam)(defendant possessed 10 containers

7   of chemicals, including a "large quantity" of sodium cyanide, along with numerous machine

8   guns, silencers, grenades, hundreds of thousands of rounds of ammunition, anti-government

9   militia literature, and documents that discussed the manufacture of various poison gases, the

10  delivery of poison gas, and how poison gas kills people)[6]; *United States v. Fries*, 2012 WL

11  689157 (D. Ariz., Feb. 28, 2012) (defendant set off a homemade 5 gallon chlorine bomb in the

12  victim's driveway, requiring evacuation of a residential neighborhood); *see also United States v.*

13  *Detrixhe*, No. 2:08-CR-42 (N.D. Tex. 2008)(defendant arranged to sell 62 pounds of sodium

14  cyanide to an informant for delivery to a member of the Aryan Brotherhood)[7]; *United States v.*

15  *Konopka*, Case No. 02-CR-224 (N.D. Ill 2002)(defendant prosecuted for storing 7 containers of

16  chemicals in Chicago Transit Authority underground passageway, including nearly 1 pound of

17  sodium cyanide and 1/4 pound of potassium cyanide; defendant admitted to being a part of

18  group called "Realm of Chaos" that had damaged power stations and communication facilities

19  in Chicago)[8].

20      Notwithstanding the repetitive hyperbole of the government to the contrary, this case

21  _____

22      [6] *See* Falk Dec, Exhibit I (documents from *United States v. Krar*, Case No.
    6:03CR36(1)(E. D. Tex 2003)(including Docket 1, Complaint; Docket 13, Detention Order;
23  Docket 109, Government Sentencing Memorandum; Docket 116, Order on Sentencing
    Objections; Docket 136, Sentencing Hearing Transcript.)
24

25      [7]  *See* Falk Dec, Exhibit J (documents from *United States v. Detrixhe*, Case No 2:08-CR-
    42-J-BB (N.D. Tex. 2008)(including Docket 1, Criminal Complaint and Docket 39, Factual
26  Basis for Plea Agreement)

27      [8] *See* Falk Dec, Exhibit K (documents from *United States v. Konopka*, Case No 02-CR-
28  224 (N.D. Ill. 2002)(including Docket 1, Criminal Complaint and Docket 20, Plea Agreement).

1   (and Count Six in particular) have nothing to do with the facts of the above-referenced cases,

2   which each involve "assassination", "terrorism", or an act "with the potential to cause mass

3   suffering." *Id.* at 2092.   There is simply no evidence of any such intent or conduct on the part of

4   Mr. Chamberlain that makes this case different in scope than the conduct the Supreme Court

5   rejected in *Bond*.  As Justice Roberts instructs, the newly narrowed definition of "chemical

6   weapon" supercedes the statutory definition with the words' "natural meaning".  *Id.* at 2090.

7   After *Bond,* the propriety of a federal prosecution under 18 U.S.C. § 229(a)(1) rises and falls on

8   whether this new definition of "chemical weapon" is met, including 1) the particular chemicals

9   that the defendant "used" and 2) the circumstances in which she used them.  *Id.*  Neither factor

10  support conclusion that the instant prosecution is a federal crime.

11         **A.     The Particular Chemical Allegedly "Used" by Mr. Chamberlain do not
                    Support the Prosecution of Count Six in Federal Court.**

12         Although the chemical charged in Count Six, sodium cyanide, is clearly a "toxic

13  chemical" as defined by the statute, the chemical compounds Bond possessed had equally

14  dangerous toxic properties and were similarly lethal.  *See* Falk Dec., Exhibit L, Brief for United

15  States in *Bond v. United States*, No. 12-158 (May 8, 2013) at 4 ("One-half a teaspoon of 10-

16  chlorophenoxarsine (which is not available to the general public) may be lethal orally to an

17  adult, which a few ingested crystals could kill a child.  One to one-and-one-half teaspoons may

18  be lethal to the touch . . . the other chemical, potassium dichromate, is lethal in even smaller

19  quantities. . ."  There is accordingly no rational basis from which this Court can distinguish

20  sodium cyanide from the chemicals at issue in *Bond*.  Neither set of chemicals appears in the

21  CWC's Annex on Chemicals (see Falk Dec., Exhibit M) and neither substance bear a

22  "resemblance to the deadly toxins that are 'of particular danger to the objectives of the

23  Convention.'" Sodium cyanide, like the chemicals possessed by Bond, can be lawfully obtained

24  and has gainful societal uses in the gold mining industry.  It is a far cry from sarin or mustard

25  gas.  *Bond*, 134 S. Ct. at 2084.

26         The quantity of chemical at issue here mandate a similar conclusion, as there is

27  absolutely no federal interest implicated in Mr. Chamberlain's alleged simple possession of *1*

28

*teaspoon* of any chemical – even sodium cyanide – without more.  As noted by Bond, such a prosecution is something that "the Convention itself does not require . . .federal possessory crimes are rare and are typically reserved for exceedingly dangerous substances or materials, and/or include an explicit jurisdictional element."  Falk Dec., Exh. H, Brief for Petitioner, at 45.  Though the Supreme Court in *Bond* seemingly approved of other federal prosecutions involving possession of cyanide, the quantities at issue were far greater and the circumstances of use were far more serious.  *See, e.g*, *Ghane*,  673 F.3d at 776; *id*. at 776, n. 3 (defendant possessed "177 grams of 75% pure potassium cyanide" and had described thoughts of harming numerous other people affiliated with the Corps of Engineers); *Krar* (large quantity of sodium cyanide at issue along with 9 other containers of chemicals, arsenal of weapons and anti-government literature); *Detrixhe* (attempt to sell 62 pounds of sodium cyanide to undercover agent for use by white supremacist group).  A finding by this Court that the government has a legitimate federal interest in prosecuting the simple possession of a mere teaspoon of a toxic chemical is tantamount to a holding that *every poisoning case* – regardless of substance or quantity, is a federal crime.  This conclusion would directly violate the federalism principles that the Supreme Court in *Bond* so deliberately protected.

### B.   The Circumstances in Which Mr. Chamberlain Allegedly "Used" the Sodium Cyanide Do Not Support the Prosecution of this Count in Federal Court.

Nor do the circumstances in which Mr. Chamberlain is alleged to have "used" the sodium cyanide support the instant prosecution.  In *Bond*, the Supreme Court viewed "use as a weapon" as "typically connot[ing] '[a]n instrument of offensive or defensive combat" or "an instrument of attack or defense in combat, as a gun, missile or sword."  *Id.* at 2090.  Indeed, critical to the Court's holding was a common sense conclusion that Bond's actions did not portray the type of "warlike" action that the Chemical Weapons Convention intended to address.  *Id*.  Here, the government will not present any evidence at trial that Mr. Chamberlain ever used, threatened to use, or attempted to use the sodium cyanide to harm *anyone* – even less harmful behavior than the defendant in *Bond*, who actually did use the chemicals against another person.  In contrast, here there is no evidence that the substance ever left Mr. Chamberlain's apartment.

The facts of the instant case accordingly fall even lower on the totem pole than *Bond*, who at least used chemicals to commit a "common law assault" that could arguably be categorized as an "assassination."

In summary, the government has no evidence that the substance allegedly possessed by Mr. Chamberlain was an extremely dangerous substance *in a quantity*, or *under circumstances* that constituted assassination, terrorism, or had "the potential to cause mass suffering." *Id*. at 2092.   In no uncertain terms should the conduct alleged against Mr. Chamberlain in Count Six – simple possession of less than a teaspoon of sodium cyanide -  subject him to indeterminate federal sentencing penalty of "any term of years" and up to life imprisonment in federal prison. This Court should avoid the grave ramifications of this absurd result, and hold that § 229(a)(1) does not reach the conduct alleged in this case.

## II.  THIS COURT MUST DISMISS COUNT SIX BECAUSE 18 U.S.C. § 229(a)(1) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD, BOTH AS INTERPRETED BY THE SUPREME COURT IN *BOND* AND BECAUSE THE SUPREME COURT'S NEW DEFINITION OF "CHEMICAL WEAPON" FAILS CONSTITUTIONAL SCRUTINY

The Due Process Clause requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  This fair warning requirement protects a person's right to "steer between lawful and unlawful conduct,"  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), by insisting that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  *Bouie v. City of Columbia*, 378 U.S. 347, 351 (964) (citation omitted).  Relatedly, a statute may not be so broad and unconstrained as to "encourage arbitrary and discriminatory enforcement."  *Kolender*, 461 U.S. at 357.  Vague laws leave the line between lawful and illegal conduct to be drawn "on an ad hoc and subjective basis" by those who enforce the statute, inevitably leading to disparate treatment of similarly situated defendants based on the happenstance of the understanding adopted by particular police officers, prosecutor, judges, and juries.  *Id*. at 109.

In evaluating whether or not a statute is unconstitutionally vague, this Court engages in a

1   two part analysis; (1) the statute must define the offense with sufficient definiteness to provide

2   fair warning or adequate notice as to what conduct is prohibited, and (2) it must also define the

3   offense in a manner that does not encourage arbitrary and discriminatory enforcement.  *See*

4   *United States v. Washam*, 312 F.3d 926, 929 (8th Cir. 2012).  As to overbreadth, a statute is

5   constitutionally infirm if it prohibits constitutionally protected conduct in addition to the

6   conduct the statute seeks to proscribe.  *See Graynard*, 408 U.S. at 114.  "What renders a statute

7   vague is not the possibility that it will sometimes be difficult to determine whether the

8   incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what

9   that fact is."  *United States v. Williams*, 553 U.S. 285, 306 (2008).

10          Where a statute imposes a criminal penalty, the standard of certainty required in a statute

11   is higher to address due process concerns.  *See Village of Hoffman Estates v. Flipside*, 102 S. Ct.

12   1186 (1982).  Moreover, a court may invalidate a criminal statute on vagueness grounds even if

13   there is some perceived valid application.  *See Kolender*, 103 S. Ct. at 1859, n. 8; *see also*

14   *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015)("Our holdings squarely contradict the

15   theory that a vague provision is constitutional merely because there is some conduct that clearly

16   falls within the statute's grasp.")  As *Johnson* makes clear, facial challenges to criminal statutes

17   that do not implicate the First Amendment are valid, even where there is some possible non-

18   vague construction.  This is precisely what the petitioner did in *Johnson*; accordingly, Mr.

19   Chamberlain here raises both facial and as-applied challenges to the statute.  *Id; see also id.* at

20   2574 (Alito, J,. dissenting)(lamenting the majority's dismissal of precedent limiting facial

21   challenges to those statutes vague in all applications.)

22          Here, the Supreme Court in *Bond* interpreted the Chemical Weapons Act in a manner

23   that avoided constitutional issues as to the scope of the statute's *jurisdictional* reach.  This

24   action, however, did nothing to solve the many inherent *vagueness* problems with 18 U.S.C. §

25   229(a)(1); if anything, the decision rendered the statute even more impermissibly vague.  *See*

26   *Bond*, 134 S. Ct. at 2097 (Scalia, J., concurring).  Both 1) a plain reading of the statutory

27   language, and 2) an interpretive reading of the "new" definition of chemical weapon post-*Bond*

28

compel this Court's conclusion that 18 U.S.C. § 229(a)(1) is hopelessly vague.

**A.**      **The Plain Text of the Statute is Unconstitutionally Vague**

Under the plain text of 18 U.S.C. § 229(a)(1), a defendant is guilty of a violation of the Chemical Weapons Act by 1) possessing any toxic chemical, in any amount, 2) for any purpose other than articulated, exempted purposes, so long as the type and quantity of the toxic chemical is consistent with those purposes.  *See* 18 U.S.C. § 229(a)(1) and §229F(1)(A).  These "permissible purposes" are further outlined in 18 U.S.C. §229F(7), which sets forth four categories of non-prohibited conduct; (A) peaceful purposes, defined as "any peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity, or other activity", (B) protective purposes, further defined as "any purpose directly related to protection against toxic chemicals and to protection against chemical weapons", © unrelated military purposes, and (D) law enforcement purposes.  *Id.*

Simply put, several of these areas of non-prohibited conduct are so overly broad, it is impossible for the average person to decipher the line between prohibited and non-prohibited conduct.  Specifically, § 229F(7)(A)  is completely unclear as to what a non-prohibited "other activity" would or would not be; this definition simply allows a federal prosecutor to be the ultimate arbiter of whether an ordinary citizen's activity with respect to a toxic chemical is criminal.   Is it a prohibited "research" purpose to possess a teaspoon of a chemical out of curiosity, however morbid that curiosity may be, without any intent to harm another?  Is it a prohibited "medical" or "pharmaceutical" purpose to possess a chemical with the intent to commit suicide?  What about the possession of sodium cyanide for an "other activity" – such as the poisoning a pesky raccoon that consistently lurks in one's garage at night?  The exemplars are endless as to the realm of possibilities for prohibited versus non-prohibited conduct under this definition.  This is particularly true in the instant prosecution that alleges possession of *less than one teaspoon* of sodium cyanide  - a quantity that is consistent with many potential "other purposes" besides deployment as a chemical weapon.

The statute's vague definitions simply do not provide the average person, including Mr.

Chamberlain, with adequate notice of the line between criminal and non-criminal possession of toxic chemicals. This is particularly true when the Court considers the incredibly broad definition the statute sets forth of "toxic chemical" - a reach that compelled the *Bond* majority to conclude that the poisoning of a goldfish with vinegar by a frustrated parent is covered. *See Bond*, 134 S. Ct. at 2091. Simply put, when a statute's drafting calls into question whether or not "teaching your child a lesson" falls within the scope of exempted "other activity", this Court should find that statute unconstitutionally vague.

### B.     The "New" § 229 Exacerbates the Statute's Vagueness Problems

As artfully articulated by Justice Scalia in concurrence, *Bond*'s majority holding applying the "clear statement" rule for jurisdictional purposes grossly compounds the statute's vagueness problems. *Id*. at 2097. As instructed by the Bond majority, reviewing courts must now evaluate federal prosecutions under the CWA by looking at the "natural meaning" (as opposed to "statutory definition") of chemical weapon, and consider "the particular chemicals used and the circumstances in which [the defendant] used them" to determine whether a federal crime has occurred. Moving forward, possession of a toxic chemical is only considered possession of a "chemical weapon" if it is "the sort that an ordinary person would associate with instruments of chemical warfare" under circumstances that suggest "combat" and/or comprise "acts of war, assassination, and terrorism." These utterly arbitrary definitions and parameters leave the average person with "countless" questions for which "one guess is as bad as another." *Id.*; *see also* Bradley, Current Developments: Federalism, Treaty Implementation, and Political Process: *Bond v. United States*. 108 A.J.I.L 486, 495 (July 2014)("As Justice Scalia pointed out in his concurrence, the addition of these fairly indeterminate contextual considerations, which are not themselves set forth in the statute or defined by Congress, may make it difficult for the statute to provide sufficient notice to potential defendants of what conduct the statute is criminalizing.")

The application of this new definition to the facts of Mr. Chamberlain's case - simple possession of less than one teaspoon of sodium cyanide – further cloud the issue. It is hard to imagine a situation where possession of 1 teaspoon of sodium cyanide is "warlike" - even if the

Mr. Chamberlain's theoretical "target" was another person.  Is it the nature of the target that matters in this definition, or, perhaps, the mode of "attack?" How do the "circumstances" of the possession affect the conclusion as to whether the alleged conduct was "warlike?"

When a statute is so broad and unintelligible, as the "new" § 229(a)(1) is here, it does not give an ordinary person sufficient notice to allow a person to bring her/his actions into compliance with the law; nor does it allow a jury or a court to determine who is fairly in violation of the law and who is not.  Instead, a vague statute allows for the exact thing the Due Process Clause is designed to protect against: arbitrary and discriminatory enforcement of a statute without fair warning – in language a person of ordinary intelligence would understand – of what the law intends to prohibit.  Under either evaluation, 18 U.S.C. 229(a)(1) is unconstitutionally vague both facially and as applied to Mr. Chamberlain.  Count Six must be dismissed.

**III.    THIS COURT MUST DISMISS COUNT SIX BECAUSE IN ENACTING THE BROADLY DRAFTED CHEMICAL WEAPONS ACT, CONGRESS EXCEEDED ITS AUTHORITY IN VIOLATION OF THE 10TH AMENDMENT**

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  As drafted, §229 violates the Tenth Amendment because it breaches the principles of federalism by permitting a general federal police power and allowing for federal prosecution of localized offenses.  This is not a valid exercise of constitutional authority.  As argued by Bond, "if section 229 really made every malicious use of chemicals a federal crime, it clearly would exceed Congress' limited and enumerated powers . Congress lacks the power to criminalize every malicious use of chemicals for the simple reason that it lacks a general police power."  Falk Dec., Exhibit H, (Brief for Petitioner) at 20.

Because 18 U.S.C. § 229(a)(1) does not contain a federal interest element or state a constitutional basis for its enactment, its only survives constitutional scrutiny if Congress' authority can be located elsewhere in the Constitution.  In *Bond*, the government asserted that

such authority derives, *carte blanche*, from the Treaty Clause read in concert with the Necessary and Proper Clause.[9]  Bond disagreed.  While the Supreme Court declined to address the constitutional issues in that case because it overturned Bond's conviction by means of statutory interpretation, the Court should address that question here if necessary.[10]  Neither the Commerce Clause, nor the Treaty Power in connection with the Necessary and Proper Clause support the expansive wording of § 229(a)(1), let alone the present prosecution.

### A.   18 U.S.C.  Exceeds Congress's Authority Under the Treaty Clause Read in Concert with the Necessary and Proper Clause

#### 1.   As Applied to Mr. Chamberlain's Conduct, the Act is an Unconstitutional Extension of Federal Police Power

In *Bond*, the government argued that Congress has unlimited power to enact domestic legislation that implements treaties, so long as the legislation does not impact the Bill of Rights. Bond objected to that argument, noting that such an interpretation would enable Congress to enact countless unconstitutional laws under the auspices of enacting a treaty.  *See* Falk Dec., Exhibit H, Brief for Petitioner at 27.  Arguing that *Missouri v. Holland,* 252 U.S. 416, 432 (1920) did not confer carte blanche authority on the part of Congress to enact any legislation it wished to implement a treaty, Bond argued that the implementation statute was unconstitutional as applied to her conduct despite the fact that the Convention is a valid treaty.

Here, as in *Bond*, the Chemical Weapons Act as drafted is plainly unconstitutional, as it reaches *every* potential malicious use and questionable possession of *every* toxic chemical.  The existence of a valid, non self-executing treaty undergirding the Chemical Weapons Act (the Convention) does not insulate the Act from constitutional scrutiny.  *See Reid v. Covert*, 354 U.S.

---

[9] *See Bond*, 134 S.Ct. at 2087.  The Supreme Court found that the government waived its alternate argument that the enactment of the CWC fell within Congress' authority under the Commerce Clause.  *Id.*

[10] The Court need only address the constitutional questions if the Court disagrees with Mr. Chamberlain and holds that his conduct, as alleged and/or proved up at trial, falls within the boundaries of permissible federal prosecutions carved out by the *Bond* majority in its interpretation of the proper scope of 18 U.S.C. § 229(a)(1).

1, 16 (1957)("No agreement with a foreign nation can confer power on the Congress, or on any

other branch of government, which is free from the restraints of the Constitution.").  Although

the treaty itself may be valid, Congress' effort to implement that treaty through the CWA fails

such scrutiny.  As previously argued, the Chemical Weapons Act cannot be viewed as anything

other than a gross overexertion of a non-existent federal police power.  The 10th Amendment

directly forbids this result.  *See United States v. Lopez*, 514 U.S. 549, 561 n 3 (1995)("Under our

federal system, the States possess primary authority for defining and enforcing the criminal

law.")(citations omitted); *see also* Falk Dec., Exhibit H, Brief for Petitioner at 22 ("In keeping

with that basic division of power, this Court has never accepted the argument that Congress may

regulate criminal conduct with no nexus to matters of federal concern.")

     If this Court need go so far, the Court should find that the application of the Act to Mr.

Chamberlain on Count Six of the Third Superceding Indictment is an unconstitutional extension

of the Necessary and Proper Clause, as applied to the Treaty Clause.  Individuals accused of

simple possession of a teaspoon of a non-illegal toxic chemical, absent more, neither implicates

the concerns of the Convention nor can be understood as a meaningful (let alone constitutional)

effort to implement it.  *Id.* at 58.  There is little doubt that our international treaty partners have

nothing at stake were Mr. Chamberlain prosecuted and convicted (or acquitted) for possessing

less than a teaspoon of a toxic chemical.  As was the case with Carol Anne Bond, the instant

prosecution is far afield of the types of national and international concerns embodied in the

treaty.  The implementation statute is accordingly unconstitutional as applied to Mr.

Chamberlain.

     As argued by Bond, *Holland* does not compel a contrary result.  *See Bond*, 134 S. Ct. at

2098 (Scalia, J., concurring).   In that case, the Supreme Court upheld the Migratory Bird Treaty

Act of 1918, an implementation statute addressing "the preservation of migratory birds known to

cross the border with Canada."  Falk Dec., Exhibit H, at 28.  There, the primary argument raised

was the invalidity of the treaty itself.  In rejecting this argument, the majority opinion held, in

dicta, that "if the treaty is valid there can be no dispute about the validity of the statute under

Article I, Section 8, as a necessary and proper means to execute the powers of the government." *Holland,* 252 U.S. at 432.  Bond disagreed with the government's interpretation that this statement in *Holland* essentially gives the government a blank check to enact legislation in the name of a valid treaty, as the Court in *Holland* "considered the relative national and state interests, and it concluded that the 'national interest of very nearly the first magnitude' trumped what it viewed as a minimal interest in birds 'only transitorily within the States and ha[ving] no permanent habitat therein." Falk Dec. Exhibit H, Brief for Petitioner at 29 (citing *Holland*, 252 U.S. at 435).  As pointed out by Bond, this analysis would have been largely unnecessary had the Court genuinely held the view that the federal government could do whatever it wanted, whenever it wanted simply because a valid treaty was in play.  *Id.*  For similar reasons, this Court should hold that *Holland*'s dicta[11] cannot save the Act from constitutional scrutiny as applied to Mr. Chamberlain's conduct.[12]

//

//

---

[11] Mr. Chamberlain alternatively argues that to the extent this Court finds *Holland* controlling, it should be overruled, because "a federal power to implement treaties unconstrained by the Constitution's structural protections of liberty is incompatible with our founding document. . . if *Holland* really stands for the proposition that any legislation that rationally implements a valid, non-self executing treaty is perforce constitutional, then Holland is incompatible with more recent precedents and the Constitution, and it should be overruled." *See* Falk Dec, Exhibit H, Petitioner's Brief at 33-38.  In making this argument, Mr. Chamberlain recognizes that this Court not in a position to overrule Supreme Court precedent.  He merely makes this argument to ensure the issue is properly preserved for any necessary appeal.

[12] Recently, in *United States v. Fries,* 781 F.3d 1137 (9th Cir. 2015) the Ninth Circuit purported to consider the constitutionality of 18 U.S.C. § 229 as applied to a defendant who set off multiple five-gallon-container chlorine bombs in a residential Arizona neighborhood.  *Id.*, 781 F.3d at 1148.  There, the Ninth Circuit upheld the application of the statute to Fries – largely because the Supreme Court had cited Fries' prosecution with approval in holding that the Act did not, in contrast, apply to Bond.  *Fries* does not discuss *Holland*, nor does it engage in any significant analysis of federalism principles.  All told, the Ninth Circuit's decision upholding the constitutionality of Fries' prosecution under 18 U.S.C. § 229 is nothing more than a holding that his conduct fit comfortably within the parameters of statutory interpretation articulated in Bond. Fries is accordingly no bar to this Court ruling otherwise when considering the constitutionality of applying the Act to Mr. Chamberlain's alleged conduct.

1

2        2.      Mr. Chamberlain Concurs with Justices Scalia, Thomas and Alito that the
Treaty Power is a Limited Federal Power and that the Chemical Weapons

3              Act, as Drafted, Well Exceeds Congress' Authority to Implement
Legislation to Further a Treaty Under the Necessary and Proper Clause

4

5        Although acknowledging that such an argument may be interpreted by this Court

6 as contrary to *Holland,* Mr. Chamberlain additionally preserves the argument for appeal (if

7 necessary) that the Chemical Weapons Convention (a non-self executing treaty) as drafted,

8 exceeds the scope of the Treaty Power as articulated in the Constitution and is thus facially

9 unconstitutional. As succinctly articulated by Justice Alito:

10        For the reasons set out in Parts I-III of Justice Thomas' concurring
opinion, which I join, I believe that the treaty power is limited to agreements that

11      address matters of legitimate international concern. The treaty pursuant to which
§ 229 was enacted, the Chemical Weapons Convention, is not self-executing, and

12      thus the Convention itself does not have domestic effect without congressional
action. The control of true chemical weapons, as that term is customarily

13      understood, is a matter of great international concern, and therefore the heart of
the Convention clearly represents a valid exercise of the treaty power. But insofar

14      as the Convention may be read to obligate the United States to enact domestic
legislation criminalizing conduct of the sort at issue in this case, which typically

15      is the sort of conduct regulated by the States, the Convention exceeds the scope of
the treaty power. Section 229 cannot be regarded as necessary and proper to

16      carry into execution the treaty power, and accordingly it lies outside Congress'
reach unless supported by some other power enumerated in the Constitution. The

17      government has presented no such justification for this statute. For this reason, I
would reverse petitioner's conviction on constitutional grounds.

18        *Bond*, 134 S. Ct. at 2111 (Alito, J., concurring in the judgment). For these reasons, Mr.

19 Chamberlain additionally argues that 18 U.S.C. § 229(a)(1) is facially unconstitutional, as its

20 broad language criminalizes conduct on the federal level well in excess of the goals articulated

21 by the Convention. This statute, as drafted, cannot be read as "necessary and proper" to

22 implement the legitimate national and international concerns of the Treaty, which is far more

23 limited in scope than the reach of the implementation statute. The Act as drafted accordingly

24 violates the 10th Amendment on its face, as it is an unconstitutional extension of federal power

25 that neither the Necessary and Proper Clause nor the Treaty Clause justifies.

26 //

27 //

28

*US v. Chamberlain*, Case No. 14-0316 VC;
Def.'s First Motion to Dismiss/Motion for
Judgment of Acquittal Re: Count Six       24

1

2

**B.    18 U.S.C. § 229(a)(1) Exceeds Congress's Authority Under the Commerce Clause**

3      By its terms, § 229 also exceeds the scope of Congress's authority under the Commerce

4  Clause because it purports to regulate non-commercial, intrastate activity – the alleged mere

5  possession of a toxic chemical – that does not substantially affect interstate commerce.  On its

6  face, the statute contains no requirement that the conduct make use of channels of interstate

7  commerce, involved instrumentalities in commerce, or have a substantial effect on commerce.

8  *See United States v. Lopez*, 514 U.S. 549 (1995) (holding that Congress exceeded the scope of its

9  Commerce Clause powers in statute that criminalized gun possession near schools).

10      The Supreme Court has emphatically reminded that lower courts and Congress that

11  "even under our modern, expansive interpretation of the Commerce Clause, Congress'

12  regulatory authority is not without effective bounds."  *United States v. Morrison,* 529 U.S. 598,

13  608 (2000) (citing *Lopez*, 514 U.S. at 557).  In reviewing its Commerce Clause jurisprudence as

14  set forth in *Morrison* and *Lopez*, the Supreme Court stated the following:

15      In *Lopez* and *Morrison,* the Court struck down federal statutes regulating gun possession
16  near schools and gender-motivated violence, respectively, because it found the effects of
    those activities on interstate commerce insufficiently robust. The Court emphasized the
    noneconomic nature of the regulated conduct, commenting on the law at issue in *Lopez,*
17  for example, "that by its terms [it] has nothing to do with 'commerce' or any sort of
    economic enterprise, however broadly one might define those terms." 514 U.S., at 561,
18  115 S. Ct. 1624. The Court rejected the Government's contentions that the gun law was
    valid Commerce Clause legislation because guns near schools ultimately bore on social
19  prosperity and productivity, reasoning that on that logic, Commerce Clause authority
    would effectively know no limit. Cf. *Morrison, supra,* at 615–616, 120 S. Ct. 1740
20  (rejecting comparable congressional justification for Violence Against Women Act of
    *608 1994). In order to uphold the legislation, the Court concluded, it would be
21  necessary "to pile inference upon inference in a manner that would bid fair to convert
    congressional authority under the Commerce Clause to a general police power of the sort
22  retained by the States." *Lopez,* 514 U.S., at 567, 115 S. Ct. 1624.

23  *Sabri v. United States*, 541 U.S. 600, 607-08 (2004).  Section 229(a)(1) would similarly require

24  this Court to "pile inference upon inference" in order to justify the legislation under the

25  Commerce Clause, and in so doing, would result in a grant of "general police power of the sort

26  retained by the States" for all the reasons previously stated  *Id*.  The statute is an unconstitutional

27  exercise of legislative authority under the Commerce Clause because the statute regulates non-

28

1    economic activities not affecting interstate commerce.

2         Although the Solicitor General in Bond attempted to defend 18 U.S.C. § 229(a)(1) as a

3    valid exercise of Congress' Commerce Power, Bond characterized such an argument as a

4    "nonstarter."  Falk Dec., Exhibit N, Petitioner's Reply Brief, at 3.  As pointed out by Bond, "the

5    use of chemical weapons is 'not, in any way, economic activity.'" *Id*. (citing Morrison, 529 U.S.

6    at 613).  Nor does the statute contain any jurisdictional element that reflects any intention on the

7    part of Congress to limit its application to commercial, as opposed to non-commercial activity.

8    *Id.* at 6 ("the stubborn problem for the government is that, in enacting 229, Congress' stated and

9    actual concern was with uses of chemicals that implicate the Convention, not uses of chemicals

10   that substantially affect interstate commerce.") Simply put, there is no language in the statute

11   that can be reasonably construed as sounding in commerce.

12        In response, the government here may attempt to defend § 229(a)(1) under the

13   Commerce Clause through *Gonzalez v. Raich*, 545 U.S. 1 (2005).  Again, this argument must

14   fail.  The petitioners in *Raich* attempted to carve out an exception in the Controlled Substances

15   Act to federal regulation of intrastate, home grown marijuana, claiming that such an exercise of

16   authority exceeded Congress' power under the Commerce Clause.  *Id*. at 15.  In rejecting this

17   argument, the Supreme Court held that such local regulation was an essential component to

18   guaranteeing the viability of " a larger regulation of economic activity, in which the regulatory

19   scheme could be undercut unless intrastate activity was regulated."  *Id*. at 25-26.  Unlike the

20   Chemical Weapons Act, the activities regulated by the CSA are "quintessentially economic"

21   because it addresses the "production, distribution, and consumption of commodities for which

22   there is an established, and lucrative, interstate market."  Because there is no meaningful way to

23   distinguish between intrastate and interstate marijuana (such as packaging or labeling

24   requirements), "a nationwide exemption" for home grown marijuana would easily thwart

25   regulation of the interstate market.  *Id*. at 25; *id*. at 28.  Congress' extension of its authority to

26   purely *intrastate* activity thus bears a rational relationship to the goals of the legitimate

27   economic regulation of the *interstate* market for marijuana.  *Id*.

28

The Chemical Weapons Act, in contrast, has no nexus to commerce whatsoever.  Falk Dec., Exh. N, Petitioner's Reply Brief 8 ("that statute cannot be defended as something it is not and never pretended to be.") "[Any] attempt to analogize this situation to its need to reach fungible home-grown marijuana is absurd; Congress is not trying to eliminate vinegar or the countless other household chemicals that can be used for criminal purposes from interstate commerce."  Because of this utter lack of nexus, the CWA cannot survive a facial challenge to the extent this Court views it as proper Commerce Clause legislation.

Moreover, as applied to the allegations of wrongdoing on the part of Mr. Chamberlain, Count Six cannot withstand constitutional scrutiny by means of the Commerce Clause.  The case at best involves an alleged possession of a teaspoon of sodium cyanide; to date, the government has not produced any evidence as to where or how Mr. Chamberlain allegedly procured the sodium cyanide.  His actions have no nexus to interstate commerce, as there is not even any evidence in this case that Mr. Chamberlain allegedly obtained the sodium cyanide from out of state, or even that he used "interstate" methods to do so.  As previously argued, the evidence suggests that the sodium cyanide never left Mr. Chamberlain's apartment.  Nothing about his case suggests any action implicating interstate economic or commercial activity.  The Commerce Clause cannot save Count Six.

1

2                                    **CONCLUSION**

3          Section 229 goes well beyond any potentially legitimate exercise of authority, punishing

4   any person who possesses any toxin even within purely local bounds and without any tie

5   whatsoever to international, or intra-national, activities.  Even as narrowed by the Supreme

6   Court in Bond, the statute does not apply to the government's allegations of Mr. Chamberlain's

7   purely local conduct.  Use of Section 229 to prosecute Mr. Chamberlain for simple possession of

8   a minute quantity of a toxic chemical is analogous to the Pennsylvania U.S. Attorney's office

9   prosecuting Carol Ann Bond for merely possessing the chemicals she had  – even without the

10  assaultive conduct alleged.  Such an exercise of power would have been soundly rejected by the

11  Supreme Court, and should be rejected here.  The prosecution on Count Six is beyond that

12  permitted by Article I, section 8, or any other part of the Constitution.  The statute is invalid on

13  its face and as applied here.

14         Were this Court to allow the instant prosecution to go forward on Count Six, it would

15  open the floodgates to scores of federal prosecutions for possession of minute quantities of toxic

16  chemicals for any *potentially* "nonpeaceful" purpose - the definition of which is the "anyone's

17  guess" that so troubled Justice Scalia in his concurrence.  It would render every poisoning case

18  in American a federal crime.  This result is one that this Court should not sanction.  Dismissal of

19  Count Six (or a Judgment of Acquittal at the close of the government's evidence) is appropriate

20  and necessary.

21

22         Date: January 19, 2016

23                                               Respectfully submitted,

24                                                       /s/

25                                               ELIZABETH M. FALK
                                                 ELLEN V. LEONIDA
26                                               Assistant Federal Public Defenders

27

28

*US v. Chamberlain*, Case No. 14-0316 VC;
Def.'s First Motion to Dismiss/Motion for
Judgment of Acquittal Re: Count Six               28