BRIAN J. STRETCH (CABN 163973)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

PHILIP J. KEARNEY (CABN 114978)
ADAM WRIGHT (MABN 661283)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7368
    Fax: (415) 436-7234
    E-mail: adam.wright@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> RYAN KELLY CHAMBERLAIN II, <br><br> Defendant. | CASE NO. 14-316 VC <br><br> **SENTENCING MEMORANDUM OF THE UNITED STATES** <br><br> Date: April 6, 2016 <br> Time: 1:30 p.m. |

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................................. 1

II.  BACKGROUND .................................................................................................................... 1

    A.   Factual Background ...................................................................................................... 1

    B.   Procedural Background ................................................................................................. 4

    C.   Guidelines Calculation .................................................................................................. 5

III. ARGUMENT .......................................................................................................................... 6

    A.   Consideration of Guidelines.......................................................................................... 6

    B.   Nature of Offense ......................................................................................................... 6

    C.   Protection of the Public ................................................................................................ 8

IV.  CONCLUSION....................................................................................................................... 8

## I. INTRODUCTION

The United States respectfully recommends that the Court impose a sentence of 30 months of imprisonment, followed by three years of supervised release with special conditions, on the defendant Ryan Kelly Chamberlain II.  The parties have reached a Rule 11(c)(1)(C) agreement outlining such a sentence, which is consistent with the Sentencing Guidelines.  The recommended sentence also includes five special conditions of supervised release limiting and monitoring the defendant's use of the internet, allowing for probation searches, and forbidding contact with witnesses and law enforcement.  Such a sentence is consistent with the Guidelines, reflects the dangerous and secret nature of the conduct here, and protects the public from further crimes by the defendant.

The defendant possessed the biological toxin, abrin, as well as a firearm with a removed serial number, in his apartment on May 31, 2014.  Law enforcement agents also found numerous other items while searching the apartment: an improvised explosive device ("IED") containing shrapnel; castor beans that can be used to make ricin; and sodium cyanide.  Such conduct requires a significant custodial sentence and significant conditions of supervised release.  The proposed resolution accomplishes these objectives by asking the Court to impose a sentence of 30 months followed by three years of supervised release – a period of release that would be governed by the rigorous conditions referenced in the plea agreement.  Such a sentence is sufficient, but not greater than necessary, based on a consideration of the Sentencing Guidelines and the factors under 18 U.S.C. § 3553(a).

## II. BACKGROUND

### A. Factual Background

This case arose out of a nationwide investigation into illegal activities on the "dark" website Black Market Reloaded.  (*See* Revised Presentence Investigation Report (Docket No. 234) ("PSR") ¶¶ 11-24.)  In May 2014, federal agents focused on the defendant and his apartment in San Francisco, where agents found abrin, an illegal firearm, and numerous other items.  (*Id.* ¶¶ 25-27.)

#### 1. Investigation into Dark Web

Three related developments in 2014 allowed law enforcement to apprehend the defendant.  The first was an ongoing law enforcement investigation focused on the "dark web" and Black Market Reloaded ("BMR").  (*See* PSR ¶¶ 11-14.)  BMR was a website that sold illegal goods such as biological

agents, toxins, chemicals, explosives, and narcotics. (*Id.* ¶ 12.) BMR existed on the "dark web," a special network of computers – referred to as the Tor network – facilitating anonymous and encrypted browsing and purchasing by its users. (*Id.* ¶ 11.) Individuals need special software to access the Tor network, which allows users to hide their physical locations by concealing the internet protocol ("IP") address associated with particular computers. (*Id.*) Payments are often made through digital currency known as Bitcoins, and communications typically occurred through encrypted e-mail addresses. (*Id.* ¶¶ 12-13.) These steps serve to conceal activities on the "dark web" from law enforcement.

The second development involved the investigation of an individual who carried cyanide into a precinct of the New York Police Department in February 2014. (*See* PSR ¶¶ 17-19.) This individual, referred to as Witness 1 in the PSR, later said that he purchased the cyanide, as well as abrin, on the BMR website. (*Id.* ¶ 17.) Agents learned that Witness 1 had purchased abrin from a BMR vendor located in Sacramento, California, who shipped the toxin to Witness 1 on December 5, 2013. (*Id.*) Agents found that this particular BMR vendor advertised the production and sale of biological toxins, improvised explosives, and modified firearms. (*Id.* ¶ 19.) Agents learned that, on the same day and in the same store that this vendor shipped a package containing abrin to Witness 1, the vendor also shipped a package to "Ryan Kelly" in San Francisco – later identified as the defendant. (*Id.* ¶ 18.)

The third development involved the investigation and arrest of the BMR vendor in Sacramento. (*See* PSR ¶¶ 17-19.) Agents arrested the vendor in early May 2014 and learned a host of information implicating Chamberlain. (*Id.* ¶ 19.) The vendor admitted that he sent ground rosary peas – containing abrin – to "Ryan Kelly" in San Francisco. (*Id.* ¶ 20.) The vendor also stated that this customer had asked him about effective dosing amounts of abrin and whether an autopsy would detect abrin if it had been used to kill someone. (*Id.*) The vendor shipped the vials containing the abrin in flashlights on December 5, 2013.[1] (*Id.* ¶ 22.) The vendor stated that the customer later contacted him on encrypted e-mail address to complain that the abrin had not worked. (*Id.*) The defendant and vendor discussed an additional shipment, but neither contacted each other after February 2014. (*Id.*)

---

[1] Agents later learned that the defendant also purchased pure nicotine on BMR in June 2013. (PSR ¶¶ 23-24.) Agents learned that Chamberlain had contacted a vendor in Florida in response to an advertisement for psilocybin mushrooms. (*Id.*) The defendant then asked for pure nicotine, which the vendor extracted and sent to the defendant hidden in a VHS tape. (*Id.*) Nicotine is considered a poison by the Centers for Disease Control ("CDC"). (*Id.* ¶ 16.)

SENTENCING MEMORANDUM
CASE NO. 14-316 VC                    -2-

### 2. Search of Defendant's Apartment

Agents executed a search warrant on the defendant's residence on May 30, 2014. (*See* PSR ¶¶ 25-26.) After seeing the defendant leave the apartment and then return to the area, agents identified themselves and asked Chamberlain if he would be willing to talk at a nearby coffee shop. (*Id.* ¶ 25.) During this interview, Chamberlain admitted that he was aware of the Tor network, and he explained that he sometimes played poker on the "dark web." (*Id.*) The defendant asked to leave, since he was not under arrest, and he walked to his personal vehicle and drove away. (*Id.*) Although a surveillance team attempted to follow the defendant, Chamberlain drove at high speeds, failed to stop at traffic lights and signs, and eventually evaded the law enforcement team. (*Id.*)

Meanwhile, a group of agents trained in hazardous material investigations began searching the defendant's apartment pursuant to the federal warrant. (PSR ¶ 26.) During the search, they observed an improvised explosive device ("IED") in a screw-top jar concealed in a messenger-style shoulder bag. (*Id.*) After evacuating the scene, bomb technicians took an x-ray image of the jar, which contained batteries, a powdery green substance later identified as strike anywhere matchstick powder, a model rocket motor, a circuit board, and an antenna. (Plea Agreement ¶ 2; PSR ¶ 26.) They also observed various forms of shrapnel in the jar, which included ball bearings and screws, as well as a remote control nearby. (PSR ¶ 26.) Bomb technicians took steps to render the IED safe. (*Id.*)

Agents then resumed the search of the defendant's apartment. (PSR ¶ 26.) Agents found two vials, concealed in flashlights, which had been shipped by the BMR vendor in Sacramento. (*Id.*) These vials contained ground rosary peas at the time that they were shipped, but they had been emptied by the time of the search. (Plea Agreement ¶ 2.) Agents also found a .22 caliber Derringer pistol with a removed serial number. (*Id.*) The hand-size gun was found loaded in the defendant's desk, and elsewhere in the apartment agents found 42 additional rounds of ammunition for the pistol. (PSR ¶ 26.)

During the initial search and several subsequent searches of the apartment, agents found numerous other items. Agents found a bag of castor beans, sodium cyanide, and several pneu-dart syringes. (Plea Agreement ¶ 2.) The castor beans can be used to make another biological toxin, ricin. (PSR ¶ 26.) Abrin and ricin are lethal to human beings in small doses, and symptoms from abrin or ricin poisoning include difficulty breathing, nausea, vomiting, and diarrhea, with possible death occurring

within 36 to 72 hours.  (PSR ¶ 15.)  There are no known antidotes for abrin or ricin poisoning.[2]  (*Id.*)

Agents also found numerous other substances in the apartment, including what government testing showed to be Gamma Butyrolactone ("GBL"), chloroform, and Salvinorin A.  (PSR ¶ 26.)  After a several day manhunt, agents arrested the defendant on June 2, 2014.  (*Id.* ¶ 27.)

### B.     Procedural Background

The government filed several indictments as the investigation continued in this matter.  (*See* PSR ¶¶ 2-5.)  The Third Superseding Indictment, which was filed in October 22, 2015, charged the defendant with six violations of federal law.  (Docket No. 131.)  The indictment alleged that the defendant unlawfully possessed an unregistered destructive device, in violation of 26 U.S.C. § 5861(d)(c)(1); a firearm with the serial number removed, in violation of 18 U.S.C. § 922(k); the biological toxin, abrin, for use as a weapon, in violation of 18 U.S.C. § 175(a), and for non-peaceful purposes, in violation of 18 U.S.C. § 175(b); and a chemical weapon, sodium cyanide, in violation of 18 U.S.C. § 229.  The indictment also charged the defendant with attempting to manufacture or possess another biological toxin, ricin, for use as a weapon, in violation of 18 U.S.C. § 175(a).

As part of the proposed resolution, the government filed a two-count Information on February 16, 2016.  (Docket No. 226.)  Count One charges the defendant with unregistered possession of a biological agent or toxin, abrin, in violation of 18 U.S.C. § 175b(c)(1).  Count Two charges the defendant with possession of a firearm with the serial number removed, in violation of 18 U.S.C. § 922(k).  The Information also contains forfeiture allegations regarding the components of the IED, the firearm and ammunition, abrin, items used to conceal abrin, ricin, and sodium cyanide.

The defendant pleaded guilty to both counts of the Information on the day that it was filed.  (Docket No. 227.)  As part of the plea, Chamberlain agreed to "truthfully provide all information and evidence I have concerning the offenses that were part of the same course of conduct, including the sources of the items in my apartment, my activities on Black Market Reloaded and any other 'dark web' sites, and the charges in the Third Superseding Indictment."  (Plea Agreement ¶ 13.)  The defendant also

---

[2] Abrin and ricin are also listed as selected agents by the United States Department of Health and Human Services.  (*Id.*)  As such, abrin and ricin have been found to be among biological agents and toxins that have potential to pose a severe threat to public health and safety.  (*Id.*)  The defendant possessed abrin without registering it as required.  (Plea Agreement ¶ 2.)

SENTENCING MEMORANDUM
CASE NO. 14-316 VC                          -4-

agreed to the imposition of five special conditions of release, which included probation searches, limitations on internet use, monitoring of internet use, a no-contact order for witnesses and members of law enforcement, and mental health treatment. (*Id.* ¶ 9.) Without admitting possession, the defendant agreed to forfeit any interest he had in the items found in the jar, as well as the various substances, the pneu-dart syringes, and 12 electronic items found in his apartment. (*Id.* ¶ 12.)

### C. Guidelines Calculation

The government agrees with the Probation Office's revised calculation of the Sentencing Guidelines.[3] This calculation results in an offense level of 19, a criminal history category of one, and a Guidelines range of 30 to 37 months.

The PSR correctly calculates the total offense level as 19. The base offense level for Count One is 22, since the defendant has pleaded guilty to 18 U.S.C. § 175b. (*See* PSR ¶¶ 31-43.) Count One and Count Two group under the Guidelines because they involve the same transaction – i.e., the possession of illegal items in the apartment in May 2014. (*Id.* ¶ 33.) The government supports a three-level reduction for acceptance of responsibility, which results in a total offense level of 19. (*Id.* ¶¶ 41-43.)

The PSR correctly finds that the defendant does not have any criminal history points. (*See* PSR ¶¶ 44-61.) The defendant has a total of eight prior convictions involving conduct between 1993 and 1998, but most of these convictions involved driving offenses.[4] (*Id.*) Given that none of these offenses one count under the Guidelines, the defendant is a criminal history category of one.[5]

---

[3] The government agrees with the Revised Presentence Investigation Report, which concludes that Chamberlain falls into criminal history category of one. This revision relates to the status of a 2005 conviction. Given that the conviction was for a driving offense and the unsuspended portion of the sentence was only two days, the conviction is excluded under U.S.S.G. § 4A1.2(c)(1).

[4] The defendant was convicted of operating a vehicle with a suspended license in 1993, 1995, and 1996. (PSR ¶¶ 46, 47, 48.) He engaged in conduct in 1996 that led to convictions for theft in the fifth degree, open container violations, and speeding. (*Id.* ¶¶ 49, 50, 51). He operated a vehicle without consent in 1997, which resulted in two years of imprisonment, which was suspended, two years of probation, and 80 hours of community service. (*Id.* ¶ 52.) He drove while being barred from doing so as a habitual offender in 1998, which resulted in a sentence imposed in 2005 for 90 days of imprisonment – 88 of which was suspended – and a $1,500 fine. (*Id.* ¶ 53.)

[5] The PSR also references two concerning incidents that did not result in charges being brought against the defendant. The first incident was in 2003, when the defendant was detained – but not charged – after being accused of striking an 11-year old boy on the side of the head with an umbrella. (PSR ¶ 56.) The second incident was in 2004, when the defendant was suspected – but was not charged – in the death of a cat inside an oven. (*Id.* ¶ 57.) The owner of the cat suspected the defendant, with whom she had an on-and-off relationship, but the defendant was not questioned about it; no evidence tied the defendant to the incident; and no charges were filed. (*Id.*)

## III. ARGUMENT

The government respectfully recommends a sentence of 30 months of imprisonment and three years of supervised release with special conditions, based upon a consideration of the Guidelines and 18 U.S.C. § 3553(a) factors. Such a sentence is sufficient, but not greater than necessary, for three reasons: (1) the initial benchmark provided by the Guidelines, (2) the nature of the offense and the circumstances of the defendant, and (3) the need to protect the public.

### A. Consideration of Guidelines

The first factor supporting the recommended sentence is a consideration of the Sentencing Guidelines, as required by 18 U.S.C. § 3553(a)(4). While the Guidelines are not the only consideration, they are the first one. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (stating that the Guidelines "are to be kept in mind throughout the [sentencing] process").

The defendant engaged in criminal conduct that is adequately addressed by a Guidelines sentence. The possession of abrin – a biological agent – is a serious offense with potentially deadly consequences, as is the possession of a firearm with a removed serial number. As noted above, the Guidelines range for imprisonment is 30 to 37 months. The Guidelines range for a term of supervised release, for Class D felonies such as the two crimes here, is between one and three years. *See* U.S.S.G. § 5D1.2(a)(2). The recommended period of custody of 30 months is at the low end of the Guidelines, while the recommended period of supervised release of three years is at the high end of the Guidelines range. The proposed resolution is well within the range set forth by the Guidelines.

### B. Nature of Offense

The nature and circumstances of the offense merit the sentence recommended in the plea agreement. The defendant engaged in dangerous conduct. He possessed abrin, a lethal toxin in even small amounts. He possessed an illegal firearm, designed to be untraceable and small enough to be concealed in a pocket, along with more than 40 rounds of ammunition. He also possessed an arsenal of other items that posed a potential danger to the public. Agents found sodium cyanide, a chemical weapon, as well as the materials to make ricin, another lethal toxin. They found GHB, chloroform, and

Salvinorin A, along with pneu-dart syringes.  Agents also found the material to make an IED – a jar full of explosive material and shrapnel.  The nature of the crime was serious.

In addition to being dangerous, this conduct was secret.  The defendant purchased abrin and pure nicotine on Black Market Reloaded, a site on the "dark web" that specialized in explosives, toxins, and illegal firearms.  He purchased these items using an encrypted series of servers on the Tor network, known for trafficking in illegal items outside of the view of law enforcement.  The defendant used an encrypted e-mail address to purchase abrin, another act designed to conceal his crimes.  Chamberlain also hid these items and the other described contraband – a firearm, chemicals, and an IED – in his apartment so that others could not see them.  Although the defendant's specific plans for these items are not clear, there is no doubt that their possession was secret and dangerous.

The proposed resolution addresses this conduct in two ways.  First, 30 months in custody sends a clear message that this conduct will not be tolerated.  It provides appropriate punishment for the defendant, while also deterring others who might consider stockpiling similar items.  Second, the imposition of special conditions of supervised release addresses the nature of the offense and the circumstances of the defendant.[6]  Indeed, these conditions are not merely "*reasonably related* to the nature and circumstances of the offense, as well as the history and characteristics of the defendant," as set forth by U.S.S.G. § 5D1.3(b)(1), they are *directly tied* to the offense and the defendant here.  Special Condition #1 would allow probation searches of the defendant's residence, phones, and computers, where the evidence here was hidden.  Special Condition #2 would impose limitations on internet use, including a ban on encrypted e-mail communication, Tor software, or any other "dark web" activity that were used in the offense here.  Special Condition #3 would allow monitoring of the defendant's internet use, which would deter the kind of conduct that led to the purchases here.  This combination of custody and supervision addresses the nature of the offense and the circumstances of the defendant.

---

[6] The individual circumstances of the defendant also merit the recommended special conditions of supervised release.  The defendant does not have any criminal convictions that count under the Guidelines, and he is an educated person who has held employment in the past.  In addition, the defendant has accepted responsibility and provided an extensive proffer to the government regarding his activities.  On the other hand, as noted above, his conduct was dangerous as well as secretive.  Although the defendant's background suggests that supervision is more likely to be successful, the defendant's conduct suggests that rigorous supervision is clearly necessary.

SENTENCING MEMORANDUM
CASE NO. 14-316 VC                    -7-

### C. Protection of the Public

The recommended sentence is likely to afford adequate deterrence and protect the public from further crimes by the defendant, among the factors for consideration under 18 U.S.C. § 3553(a)(2). Two aspects of the proposed sentence accomplish this objective. First, the defendant has been required to give a full and truthful accounting of the sources of the items found in his apartment, as well as his activities on BMR and other "dark web" sites. This information allows law enforcement to take steps to investigate these activities and further work to protect the public.

Second, the proposed sentence outlines special conditions of supervised release – in addition to the standard conditions of release – serve to protect the public. The defendant's internet use will be limited and monitored. The defendant will be subject to searches of his apartment at any time. The defendant will be forbidden from contacting members of law enforcement or individuals listed in the Plea Agreement. The defendant will receive mental health treatment. Should the defendant violate any of these conditions, the Court can order that these provisions be enhanced or that the period of supervised release be extended. As a result, the recommended resolution establishes a framework of supervision that will reduce the risk of the defendant committing such crimes again.

### IV. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court accept the Rule 11(c)(1)(C) plea agreement and impose a sentence of 30 months of imprisonment, followed by three years of supervised release with the special conditions set forth in the agreement.

DATED: March 30, 2016

Respectfully submitted,

BRIAN J. STRETCH
United States Attorney

_/s/_
PHILIP J. KEARNEY
ADAM WRIGHT
Assistant United States Attorneys